## SHULTZ v. DUNHAM.
### Patent Appeal No. 3168.

Court of Customs and Patent Appeals.

Dec. 4, 1933.

Brown, Jackson, Boettcher & Dienner, of Chicago, Ill. (John A. Dienner, of Chicago, Ill., of counsel), for appellant.

Barnett & Truman, of Chicago, Ill. (Percival H. Truman, of Chicago, Ill., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

On June 5, 1928, patent No. 16,985, a reissue of patent No. 1,654,759, originally filed June 12, 1926, was issued by the United States Patent Office. This reissue patent was issued on an application of the appellant filed February 25, 1928, and is upon certain improvements in steam heating systems.

The appellee filed his application on October 18, 1928, for a patent upon a similar invention. On July 17, 1928, an interference was declared by the Patent Office; the subject-matter of said interference being set out in twelve counts. These counts were claims taken from the Shultz reissue patent, and are claims 9, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25 thereof.

Counts 8 and 11 are thought to be typical of all the counts, and are as follows:

"8. In a heating system for a building, the combination of a plurality of radiators therein each having a restricted inlet opening so proportioned that the quantity of heat carrying medium admitted thereto can be regulated by variations in the pressure thereof, an automatic regulator for varying the pressure of the heat carrying medium, adjustment varying means for varying the adjustment of said pressure regulator, and thermally sensitive means exposed to variations in temperatures external to the building for governing the adjustment varying means."

"11. In a heating system, the combination of radiators each having a restricted inlet opening so proportioned that the quantity of heat carrying medium admitted thereto can be regulated by variations in the pressure of the heat carrying medium, an automatic pressure regulator loaded to a variable degree for varying the pressure of the heat carrying medium, means for loading said regulator to a variable degree comprising motor means and a temperature controlled device for governing the action of said motor means."

A motion was made in the Patent Office to dissolve the interference on the grounds that the party Dunham could not make the counts thereof, and that the elements upon which he must rely to satisfy the counts are inoperative. This motion was overruled by

the Law Examiner. The senior party Dunham also made a motion to strike out certain testimony and exhibits taken and introduced in behalf of Shultz. When the matter came on for hearing before the Examiner of Interferences, he allowed certain portions of the motion to strike, and denied the motion as to other parts of the proffered testimony. As to the right of the party Dunham to make the counts, the Examiner of Interferences was of the opinion that the counts read upon Dunham's disclosure. He also held that Dunham had established priority of invention. The matter was taken to the Board of Appeals, which held that the counts did read upon Dunham's disclosure, and that the decision of the Examiner of Interferences should be, and it was, affirmed.

Although many errors raising the various points in question are assigned in this court, appellant, upon the hearing, waives all except that of the disclosure of Dunham being insufficient to support the counts, and relies solely upon this point for reversal. It is therefore unnecessary to further allude to the other alleged errors, but the disclosures of the parties must be examined with a view to determining whether, in fact, the disclosures made by Dunham are so sufficient. A short description of the disclosure of each is necessary.

The invention in issue is a system of regulating the heat carrying medium in its distribution through the radiators of a steam heating system. Shultz discloses, by his specification and drawings, a number of radiators attached to a heating main, which main conducts the heat from a boiler. He shows no manually operated valves for these radiators, but in the supply pipe to each radiator is inserted a restricted inlet orifice, circular in form. The radiators shown in Shultz's drawings are in series, with a common supply pipe, and a common vent pipe for the waters of condensation. Inserted in the steam main from the boiler is a pressure regulator or reducing valve. This reducing valve may be of any type, but the preferred one consists of a valve plug secured on a stem with a spiral spring which presses against the valve plug and tends to hold it closed. At the lower end the valve stem is pivoted to the inner end of a balance lever, which is adjustably weighted. The other end of this balance lever is connected with the core of a solenoid. This solenoid, under varying degrees of energization, will raise or lower the weighted arm to adjust the said pressure regulator valve structure.

The said solenoid, which has been designated by the inventor as (A), is, in turn, controlled by a relay solenoid which he denominates as (B), and which, in turn, is controlled by a thermostatic device consisting of a thermometer tube in which a resistance wire extends through a body of mercury. As the mercury rises or falls, the energization of the relay solenoid is affected and this, in turn, moves the core of this solenoid (B), to which core is attached a contact finger, which, as the carrying rod rises or falls, moves back and forth in engagement, along a resistance coil. The winding of this resistance coil gradually increases in diameter as this contact rises, and as the energization of the coil in the relay solenoid (B) decreases.

Shultz states in his specification that he places his thermostat outside the building, and it is apparent, from his specification, that he is attempting to disclose the existence of a natural law to the effect that the heat pressure to be furnished to a radiator, or heating system, will vary exactly as the difference between the temperature outside of the building and inside varies. Much of his argument in this court, both orally and by his printed brief, is to the effect that he has shown and disclosed a system by which a temperature responsive thermostat so governs a pressure regulator as to cause said pressure regulator to provide steam pressures which increase or decrease according to the square of temperature difference between the inside and outside of the building. This, he argues, is done by his metering device in each radiator, and by his specially constructed solenoids and resistance coil.

The application of the party Dunham discloses a somewhat different arrangement. It discloses a series of radiators with a common steam supply pipe from the boiler, and with a common return pipe. Each radiator has a hand operated inlet valve, which may or may not be used, as desired. Each radiator also has a steam trap, for the escape of waters of condensation, of the ordinary type. Mounted in the steam supply pipe, between the boiler and the radiator supply pipes, is a pressure reducer, which is connected with a fluid filled thermostat, which, as the inventor states, may be inside or outside of the building. This pressure reducer operates valves in the supply main by two methods. Connected with the top of the pressure reducer is a pipe which is tapped into the supply main on the side farthest from the boiler. If the pressure on the radiator side of the valve decreases below the pressure in the steam main

on the boiler side, by means of a flexible diaphragm in the top of this pressure reducer, the valve will be opened until the equality of pressure is restored. Again, the effect of the temperature upon the thermostat will, by means of mechanism shown fully by the disclosure, also open or close the valve in the supply main, as required.

In other words, the pressure reducer performs a double function, namely, that of equalizing the pressure of the heating fluid in the radiators and in the supply main on both sides of this reducer and, at the same time, of making the supply of steam to be admitted to the radiators dependent upon the temperature of the spot where the thermostat may be placed.

Dunham also shows a further device for freeing the system of waters of condensation and surplus air. This is done by means of a tank connected with the return pipe of the radiator, and which receives water drawn from said pipe and which, upon being filled to a certain point, will, by a float and lever, start an electric motor and pump, which will start a hurling circuit and free the tank of the excess water and air. This latter device serves to create a partial vacuum in the return pipe of the radiator system, by drawing the condensate and air therefrom and forces the waters of condensation back into the boiler. This is substantially the Dunham disclosure.

The only question is that of the correctness of the decision of the Board of Appeals holding that the counts of the interference read upon the Dunham disclosure.

Primarily it will be observed that while it may be that the appellant has disclosed a system by which the pressure regulator shown by Shultz will provide steam pressures which increase or decrease according to the square of temperature differences, there is nothing in any of the claims which claims this feature as patentable. The Board of Appeals is of the opinion that there is no such natural law as that proposed by the appellant, namely, that a building loses heat directly proportional to the difference between the inside and outside temperatures of a building. The Board remarks, as to this theory, that such cannot be the law because the amount of heat to be furnished to a heating system will depend upon many factors; not only the difference in temperature, but also the location of a building, its structure, and other features.

We are not called upon to pass upon the inventive character of the appellant's contentions in this respect. It is sufficient to say that, while he has disclosed such a theory in his specification, he has not claimed it, and therefore cannot count upon this feature in questioning the right of the senior party to make the counts of this interference. That Dunham says nothing on this subject in his specification is immaterial, in view of the counts in issue.

Again it is argued that the party Dunham does not show this feature, "a restricted inlet opening so proportioned that the quantity of heat carrying medium admitted to the unit can be regulated by variations in pressure in the heat carrying medium." This or similar language is repeated in many of the counts, and is relied upon strongly.

So far as the disclosures of the parties are concerned, we are unable to agree with this contention. Restricted openings into the radiators are shown in the Dunham device, as fully as in the Shultz patent. In fact, it was conceded upon the hearing that such restricted openings are well known to the art. There is nothing in the size or shape or construction of these openings which differentiates them in the respective systems disclosed here. Dunham disclosed the idea of proportioning the sizes of said inlet openings. That variations of pressure in the heat carrying medium would be thus taken care of appears plainly from his specification: " * * * The orifice plate is removable so that the valve for each of the radiators may be fitted with a plate having an orifice of the proper size to provide for the admission of the proper amount of steam to the radiator dependent upon the position of the radiator with respect to the source of supply of the other radiators of the system."

Counsel for appellant argue that Dunham's hurling circuit and steam traps are essential to the operation of Dunham's system and are unnecessary in appellant's. As we read the counts of the interference, there is nothing therein which excludes the use of these Dunham appurtenances to his system. Dunham's disclosure supports the counts in their essential features. If, in addition thereto, he shows other appurtenances to his system, not disclosed by Shultz, but which do not alter or detract from the features common to both, upon which the counts are framed, the existence of such appurtenances presented no reason why the interference should have been dissolved.

Again, the appellant insists that the systems of Shultz and Dunham are so distinct as to have no common subject-matter, and

that the counts should be interpreted in accordance with what they mean in the patent itself; citing Slattery v. Larner, 36 F.(2d) 298, 17 C. C. P. A. 725; Podlesak v. McInnerney, 26 App. D. C. 399, and other cases. Counts in an interference should be given as broad a meaning as their terminology will reasonably permit. Slattery v. Larner, supra. The counts of the interference here read broadly upon the disclosures of both parties. If the appellant had been content to rest his claims upon the specific structure disclosed by him, the appellee might not have been able to make such claims. However, when he so broadens his claims as to include other systems including differing structures, he cannot complain if others having such differing structures make the same claim. These counts are broadly drawn, are not ambiguous, and must be given the broadest construction which their language will support. Limitations, not expressed, will not be read into them. Martin v. Friendly, 58 F.(2d) 421, 19 C. C. P. A. 1181; Oldroyd v. Morgan, 57 F. (2d) 358, 19 C. C. P. A. 1111.

During the pendency of this interference in the Patent Office, the party Shultz applied for a reissue of his reissued patent here in interference. The appellee thereupon moved for judgment in the interference, alleging that such application constituted a disclaimer of the subject-matter of the interference. This motion was denied by the Examiner of Interferences. Afterward, in this court, appellee moved to dismiss this appeal on the grounds stated in his previous motion for judgment, and also moved to strike certain items of testimony included in Shultz's record in the interference. These motions have been taken with the case. In view of our conclusion on the merits, we deem it unnecessary to pass upon these motions.

A suggestion of a diminution of the record was also made here by appellee and, on certiorari, certain additional parts of the record were certified up by the Patent Office. We have inspected them and find that they were reasonably necessary to the proper disposition of the issues in this appeal, as originally made by the parties.

The decision of the Board of Appeals is therefore affirmed. The costs of printing the additional record will be taxed against the appellant.

Affirmed.